06-5109. Mr. Jarrett, when you're ready. This is a breach of contract case. It comes up from a summary judgment, and it's really important that we have sufficient evidence to go to trial. And we put the standard down. I don't believe that there was any disagreement over the standard that we have to meet. We don't have to convince anybody. We need to have just enough evidence that we can go to trial. We need to have sufficient evidence that we can go to trial. We need to have sufficient questions and evidence. What evidence did we put on, and did we put on sufficient evidence? In some cases, in two of the questions, the first one, we put on overwhelming evidence. But isn't it clear that what was said to him was said by someone lacking authority to commit And what we have to do under Rule 56, of course, is we have to look at the evidence and draw the logical inferences from it, and the inferences are drawn in our favor. It's easy for the government that has all the information regarding authority. What's the argument that the person at this stage, Ewing, who made the statements that he could be a bidder and buy back the property, that that person had authority? We claim that he either had authority or his actions were ratified. And if I were to say which were the strongest arguments right now, I would have to say by far that it was ratified. It was ratified by someone who also didn't have authority. He was a legislator. No, that's not our strongest argument. That's a secondary argument. Our argument is this. If you want to know our strongest argument on ratification, it would be this, that the Assistant Secretary clearly had the right to speak for HUD. That's right in his job description. And in fact, the defendant... Assistant Secretary for what? Congressional Relations. Congressional Relations. That's correct. And he was asked by his senator, why, because of this new legislation that he came through, why would somebody who was promised something to get him to pay $500,000 to bail out HUD, why when he does that, when it comes time for HUD to live up to its promise, why do they renege? And they send it, and this is a person who speaks on HUD v. HUD. Somebody asks to speak for him, and he does. Now, I think it would be beyond question that under Rule 801 of the evidentiary rules, that this would be deemed an admission of a party. It's not conclusive, but certainly it's very strong evidence. He made an investigation. In fact, he starts off his letters by saying, look, I'd like to give you some background. And he does give background. And what does he say? Does he come back, and does he say oh, you know, he was told that, but it was by somebody who didn't have any authority? No, he doesn't tell him that, because if he told him that, that would have ended it right there. Instead, he says that the Nevada State Office told Mr. Arakaki that if his loan were ever sold, he'd have a right to bid on it. That's no big thing. I mean, he put in $500,000, and he doesn't want HUD the very next day to turn around and auction his loan and tell him that he can't bid on it. That's like throwing away $500,000. And so Mr. Arakaki said, well, you know, I understand that you people auction off your loans sometimes. This is a bad loan, it's a non-performing loan, it's a delinquent loan, and I'm putting $500,000 into it basically for three representations and promises by you. One, that you'll let me approve the defaults, because $500,000 will bring it up to date, but the interest rate was 11%, and market rates were way below that. So everybody knows it's going to be accumulated, more debt on it. And the person in charge of the loan, the asset manager, says sure, no problem, we do that. We're getting all sorts of these loans defaulting now. And they came through and they did that later on. Second thing is, yes, we're going to turn this into a performing loan for you. The interest rate lowered, we will do a discount, and so on and so forth. And how do we know that? That's in Mr. DeSales' letter too. He said, don't worry about this. Don't worry about your rights yet. Because it's technical. This loan is going to be auctioned off not to the general public, this loan is going to be auctioned off to a related entity. All the rights that you had before of working your loan from a non-performing loan to a performing loan are going to be saved. All your rights to get the loan at a discount are going to be saved. Don't worry about it. And he sends that letter back. So the right to bid was very important. Because he did not want to be put into this position. $500,000 goes in. Sold. He can't bid. He loses $500,000. This is all of his family's money. Mr. Jackson, excuse me. Yes. I'm quite sympathetic with your argument. And I think what you're saying is quite reasonable and makes a lot of sense. And I think accurately reflects what Prince bought. Yes, sir. What's troubling me, however, is that when you're dealing with sovereign immunity, the government cannot be bound to a promise without some action by someone with authority to bind it up. That's correct. That's the dilemma. Because I think that certain statements were made by Mr. Ewing and maybe others, that in the context of this business transaction could be interpreted to mean certain things. And I understand how that happened. But we see this time and time again. I understand. We have difficult situations where parties are interacting with officials, with the government, and maybe interpreting certain things to be promises and commitments on behalf of the government. But the government cannot be bound without someone acting with authority. And in this case, I don't see any evidence to suggest that either Mr. Ewing or… Mr. DeSalle. Mr. DeSalle. Okay. Had the authority to bind it up. Okay. Now, let me go back to the point that started this off. And I'd like to return to that about the gratification by Mr. DeSalle. But let's just assume that Mr. DeSalle had no authority to ratify anything. His authority was to give information, communicate information. He had his job description in there. And the government says, yes, that's what his job was, was to speak on behalf of the party to the congressmen and senators. And obviously, he did an investigation. And his investigation shows that the Nevada State Office told Mr. Arakaki he could bid. Now, the inference from that is that it was either Mr. Ewing had the authority or somebody in the office ratified it. Why is that inference strong? Because if it wasn't that way, that letter could have been very short. Nobody had authority to make that offer. It's been extremely short. But he didn't. And the second thing is he didn't say that just in one letter. He sent that in a second letter. The first letter was, don't worry about it. I know he was resent. The Nevada State Office said that, look, if it's ever sold, you have a right to bid. Don't worry about it. You've got a lot of rights you're going to lose. And he lists them on the second page of his letter. It's a technical matter. This is a HUD entity that's being sold to, not the general public. You're not going to lose anything. A year later, after the auction takes place, we get a second letter. Oh, we have to apologize. We were inaccurate. We made a mistake. The first letter said, let us reassure you. Let us reassure you. You're not going to lose anything. A year later, oh, we have to apologize. We made a mistake. In fact, you have no more rights because we didn't have any control over the loan whatsoever. And so, but he said the same thing in the second letter. The Nevada State Office told Mr. Arakaki that if that loan were ever sold, that he'd have a right to bid. And again, think about it. Here's an assistant secretary has to say to a U.S. senator that he made a mistake, gave inaccurate information the year before. The easiest out for him is to say, oh, we investigated some more and found out that the people who gave him the right to bid didn't have any authority. Presumably, the reason why Mr. DeSalle wrote to the senator was because that was his job. He was assistant secretary for legislation and congressional relations rather than someone who could track. I, Judge, my argument was that this argument is only that he's making an admission as to what happened. This is not the argument that he ratified anything. This argument assumes he has absolutely no right to contract, has no right to ratify. His right is to speak on behalf of HUD. Mr. Chairman, if you wanted to save four minutes of your time for rebuttal and some of that is passed, you can either use it or save it if you wish. I will save it, yes. Thank you very much. Mr. Major, if I'm pronouncing this correctly. Yes, Your Honor. Good Major, you'd be in the honor. Thank you, Your Honor. May it please the court. The court of federal claims correctly decided that Mr. Ewing, the loan specialist who allegedly made a promise at issue in this case, lacked the authority to enter into a contract on behalf of the government. The court also correctly decided that this alleged promise was not ratified by Mr. DeSalle, the secretary for congressional relations. Counsel, if I'm understanding Helen's argument correctly, even if we say it's not ratified by the letters Mr. DeSalle wrote to Congress, those letters indicated it was ratified by somebody. Is there any evidence anywhere that would suggest that something else occurred at some point in time to ratify it? No, there's no evidence whatsoever. None was presented by the plaintiffs. We had approximately a year of discovery. No such evidence. Should we draw that inference? Or should we say the fact that the assistant secretary for congressional relations wrote a letter suggesting that the legal – I don't remember the exact verbiage. You can probably help me with that. His letter was that the Nevada state office told Mr. Ewing that he would be able to bid. So when he says Nevada state office, should the reasonable inference be that that is Mr. Ewing, or should it be that maybe someone else gave what ratified that idea? Your Honor, it really doesn't matter because what he did say – at best, what his letter contains is an admission that Mr. Arikaki was told that he would be able to bid upon his loan. That's the exact language he used, was told. He doesn't say entered into a contract. He didn't say a promise was made. He just basically says that he was told he would be able to bid on his loan. And you agree he was told that? We don't agree because the evidence is extremely conflicting. However, if the sole issue, if authority was not the issue, if the issue before this court was – You don't agree that Mr. Ewing told him that he was – No, Mr. Ewing doesn't remember making such a promise. The plaintiff's lawyer – there were four people at the meeting. The plaintiff's lawyer, Mr. Matsuoka, testified that no promise was made. Mr. Little had testified that scenarios were played out various times. He didn't characterize it actually as a promise, but he did seem to say there was some discussion of the right to bid on the loan at the meeting. Mr. Arikaki is the only one who clearly says that there was some sort of promise and all of this information was told. We would submit that just that sole survey stated – Well, that would be clearly a fact determination that we shouldn't be making. Exactly. No one should. And if the sole issue before this court was is there or was promise made, it's not the authority issue the court decided on, I think Mr. Arikaki would have – and Ms. Arikaki would have a much better argument for saying there's a genuine issue of material fact that the court should have looked at. But instead, this was based upon the authority issue. So for the purpose of this proceeding, you are admitting or agreeing for purposes of this proceeding only that he was told that? Yes. For the purposes of this proceeding, we're willing to admit he was told. But again, being told is different from receiving a promise, and it's very different from receiving a promise from someone with authority. Ronald Reagan has a quote that someone brought to my attention recently that made me laugh as I was thinking about this case. He said the nine worst words anybody could ever hear is I'm here for the government and I'm here to help. And I think – I'm very sympathetic to Mr. Arikaki. I'm probably saying your name wrong, and I apologize. But it seems to me that he probably was told this, and I think of the four people at the meeting, who's likely to have the best recollection? The one who it really matters to, the one who's putting up $500,000. But I'm also appreciative of your idea that we have to make a decision based on authority. Well, and Mr. Arikaki also did admit that he was relying upon Mr. Mansoke and Mr. Little to determine authority on such issues. So their opinions and perspectives on this are important. But, I mean, with regards to the evidence of authority or lack of authority of Mr. Ewing, in general, as a general matter, we submitted to the court that loan sales are generally performed at headquarters, and the terms of a loan sale are set at the HUD housing office in headquarters, Washington, D.C. There's a handbook guiding the ability to make modifications to a mortgage or enter into workout agreements. The loan, Mr. Arikaki had argued that this was an oral agreement akin to a workout agreement. But workout agreements under the handbook must be in writing. And loan specialists such as Mr. Ewing don't have the ability to enter into workout agreements. The handbook explicitly has that authority delegated to the field office director of housing management who did enter into two provisional workout agreements in this case, two written provisional workout agreements in this case. But neither of those provisional workout agreements, one of which was executed immediately prior to Mr. Arikaki closing on the property, contained a right to bid on his loan. Speaking briefly with regards to Mr. DeSalle's letter and ratification, to clear up a couple of points, while Mr. Arikaki and Ms. Arikaki have argued that there was an investigation, there is no evidence of an investigation in connection with this letter. There is evidence in the record of a 1999-2000 investigation. But both of the DeSalle letters occurred in 1996 and 1997, approximately two years before HUD undertook to investigate this to that extent. And again, Mr. DeSalle himself did have no authority to enter into any sort of contract. And that's quite clear from the documents we filed with this court. Unless the court has any further questions? I think not. Thank you, Mr. Megan. Mr. Chair, this is the rebuttal time. Thank you, Your Honor. There was a further formal investigation after the two letters by Mr. DeSalle. Mr. DeSalle said that he found, by talking to the state office, if the loan were ever sold, Mr. Arikaki had a right to bid on it. Now, the next investigation was by the Inspector General. Here's what the Inspector General said. The question is, this is 398 of the appendix. The owner alleged that HUD made verbal assurances that it was unlikely HUD would ever sell the Lightning Bill as loan, but if it did, the owner would be able to bid on it. This is the Inspector General doing a formal investigation. They said, we found the allegations to be true, but not a violation of any law or regulation, not that it was a breach of contract. They didn't get into that, just whether that was a violation of a law or regulation. And it goes on to say the reason that HUD changed their mind was that new legislation came along that said they could bundle loans, and they could make a little extra money because they saved on some overhead. And the Inspector General apparently felt that if HUD wanted to change its mind, even if it gave the verbal assurances, and said, if in the future you put in your money, and if in the future we want to sell it, you get the right to bid, if it wanted to change its mind, it could. And that may not be a violation of a law, and that may not be a violation of a regulation, but that's a violation of an agreement. And for the government to come and start even questioning that they said that to Mr. Arapaki, leads me to doubt when you read some of the transcripts. Oh, they can't remember this, they can't find the records, and oh, it's up to you to prove that authority. We have the inferences. Rule 56 says every inference goes to the non-moving party. Every inference. That goes for the government, too. They get no special privileges under the evidence. Rules of evidence that are good for the private citizen are good for the government. And the evidence shows that Mr. DeSalle spoke of the office giving the assurance, when he could have clearly just said, we investigated and found no assurances. Inspector General could have just said, oh, nobody gave that assurance that had any authority, but they did. And so I submit that the inferences have to be drawn. Have to be drawn. And to have these government officials get on the stand, the witness stand, the court, and start answering some of these questions. Thank you, Mr. Chair. Please take a number of vitamins.